IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 3, 2020

## IN RE  JADARIAN C. ET AL.

**Appeal from the Juvenile Court for Knox County**
**No. 164307      Timothy E. Irwin, Judge**

_____

**No. E2019-01710-COA-R3-PT**

_____

The trial court terminated Mother's parental rights on grounds of abandonment by failure to establish a suitable home, substantial noncompliance with permanency plans, persistence of conditions, and willingness and ability to assume legal and physical custody or financial responsibility of the children. Mother appeals both the grounds for termination and that termination was in her children's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which RICHARD H. DINKINS, and THOMAS R. FRIERSON, II, JJ., joined.

Anna East Corcoran, Knoxville, Tennessee, for the appellant, Mahogany C.

Herbert H. Slatery, III, Attorney General and Reporter; Matt D. Cloutier, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

### I.   BACKGROUND

On March 13, 2019, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Respondent/Appellant Mahogany C. ("Mother") as to her three children JaDarian M.C., born in 2013, La'Niah G.M.C., born in 2014, and Raylen A.C., born in 2017.[1] The

---

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

petition, filed in Knox County Juvenile Court ("the trial court"), alleged the following as grounds for termination: abandonment by failure to establish a suitable home, substantial noncompliance with permanency plans, persistence of conditions, and failure to manifest a willingness and ability to assume custody or financial responsibility for the children. Mother filed a pro se answer denying that her rights should be terminated and a formal answer after counsel was appointed.

A trial was held on August 22, 2019. In addition to DCS, Mother, her counsel, and the guardian ad litem were present. First to testify was DCS foster care case manager Leslie Shaw. Ms. Shaw detailed DCS's involvement with Mother, which began when Mother's oldest child, JaDarian, was severely burned on his feet in an attempt to take a bath in December 2017. Mother was not present; rather the children were being supervised by Mother's then-boyfriend. The burns required overnight hospitalization, but the children were not immediately removed. Instead, in the weeks thereafter, Mother failed to bring JaDarian to multiple appointments related to his injuries and ran out of a prescription of pain pills earlier than expected. As a result, DCS filed a petition to declare the children dependent and neglected in the trial court in January 2018.

Initially, the children remained in Mother's custody notwithstanding DCS's intervention. However, a drug test administered on February 26, 2018, showed Mother positive for methamphetamines and THC. The children's guardian ad litem thereafter filed a petition for emergency removal of the children on or about March 9, 2018. The juvenile court ordered Mother to undergo hair follicle drug screening. The test, performed on March 13, 2018, was positive for cocaine. As a result, the children were placed in DCS custody by order of the trial court on March 16, 2018. Therein, the trial court found that there was probable cause to believe that the children were dependent and neglected due to Mother's positive drug screening. Mother was ordered to pay child support in the amount of $40.00 per month, per child, or $120.00 per month. According to Ms. Shaw, the trial court thereafter adjudicated the children dependent and neglected on May 8, 2018.[2]

Two permanency plans were created by DCS, agreed to by Mother, and ratified by the trial court. The plans generally required that Mother: (1) pay child support and visit regularly; (2) complete an alcohol and drug assessment and follow recommendations; (3) complete a mental health assessment and follow recommendations; (4) participate in substance abuse aftercare, such as Narcotics Anonymous; (5) participate in medication management, if necessary; (6) complete parenting education; (7) obtain and maintain a legal source of income; (8) allow quarterly home visits; (9) obtain safe and stable housing; (10) maintain a reliable transportation plan; and (11) comply with all court

---

[2] The record contains an order adjudicating the children dependent and neglected based on a hearing that occurred on May 8, 2018. This order, however, does not contain a stamp-file indicating the date of its filing.

- 2 -

orders. Mother signed a Criteria & Procedures for Termination of Parental Rights on November 27, 2018.

Mother was renting an apartment at the time of the removal of the children. Following the removal, DCS conducted several home visits of Mother's home. Sometimes, the home was clean and appropriate. On more than one occasion, however, DCS found suspected drug use in the home, twice finding marijuana cigars in the home and once when the home had the overwhelming smell of marijuana. Mother blamed these incidents on people visiting her, including an ex-boyfriend and Mother's close childhood friend. The most recent incident occurred in May 2019, after which Mother was asked to complete the nail bed drug testing. During some visits, DCS also found garbage and rotting food in the home.

Mother reported that the apartment suffered significant maintenance issues, including leaking and mold, that her landlord would not fix. As such, Mother refused to pay her rent of $130.00 per month for three months; as a result, Mother was evicted from her home. Mother later testified that she could not obtain another apartment because she did not receive services to help her pay the $650.00 security deposit. At the time, Mother was making $9.50 per hour working forty hours per week. Mother claimed that she was not able to use the money she saved by not paying rent to put toward the security deposit, as she was required to save the money for first and last month's rent and for other expenses; Mother's claimed expenses included hygienic necessities, groceries,[3] some eating out, and hair weave. Mother had various jobs throughout the period the children were in DCS custody. Mother often paid support, but not always. In the eleven months before trial, Mother had paid approximately $360.00 in support for her three children.

Following her eviction, Mother moved in with a family friend.[4] Mother testified that this home had two bedrooms and that she and the three children would share one bedroom where she had installed two bunkbeds. DCS was unable to perform a home study at this location because Mother did not inform DCS of her location until immediately before trial. At trial, Mother appeared to concede that her current housing situation was temporary and not appropriate for the children. For instance, when asked what tasks Mother had not completed under the permanency plans, Mother answered that "The only thing I need to do is get housing for me and my children, and that is the only thing I'm trying to do. That's the only thing I'm focused on right now, is getting housing for them. But other than everything else, I have done to the best of my ability." Mother also called DCS in the days before trial to inquire as to whether living in a hotel would be "safe enough" for the children to return to her custody.

---

[3] There was no proof that Mother received food stamps.
[4] Mother repeatedly refers to this individual as her "aunt" in her appellate brief. There was no testimony that this person was Mother's aunt at trial.

Mother was administered several drug screens both before and after the removal of the children. Mother tested positive for THC and methamphetamines in a February 26, 2018 screening and positive for cocaine on March 13, 2018. Following the March 2018 drug screening, however, every test that Mother took came back negative for all substances, including a July 19, 2019 test.[5] Mother admitted, however, that she had not completed any substance abuse aftercare or intensive outpatient treatment, as had been recommended by an initial assessment; Mother claimed that a subsequent assessment determined that she did not need this treatment. Additionally, on May 16, 2019, DCS requested that Mother take a nail bed drug screen. Although Mother agreed to take the drug screen, she failed to do so. DCS gave Mother a second opportunity to complete the drug screen, but Mother again failed to appear. Mother testified that her inability to appear for the screening related to her lack of transportation to the location; Mother admitted that she never considered asking DCS for help with transportation even though DCS had provided rides to Mother for drug screens in the past.

Mother testified that she owned a non-working vehicle but that she had no valid driver's license. As such, Mother's primary mode of transportation was the bus. When Mother missed appointments, she often blamed her lack of reliable transportation. And missed appointments were often an issue for Mother. For example, after Mother completed mental health and alcohol and drug assessments, she was required to attend twice monthly therapy sessions. Mother attended between eleven and thirteen therapy sessions, or approximately half that she was scheduled to attend during the relevant time period. Due to Mother's behavior in missing visits with the children, a protocol was put into place requiring Mother to arrive early for visits and call DCS twenty-four hours in advance to confirm; Mother sometimes failed to comply, resulting in her missing additional visits. Ultimately, Mother missed approximately seventeen of her forty visits following the removal, including the visit immediately before trial, which Mother testified she missed because she forgot to give DCS advance notice. According to Ms. Shaw, the children were upset when Mother failed to appear for visits, crying and believing that they did something wrong.

When Mother did attend the visits, however, they did not always go well. Although the children recognize Mother and call her "Mommy," DCS had concerns that Mother was not using the skills she learned in parenting classes during the visits. For example, Mother placed the youngest child in a 20-minute timeout, a harsh and inappropriate punishment given the child's age, and yelled at the children "a lot." Mother also had difficulty supervising all of the children, focusing primarily on the younger children. Mother initially forgot to bring necessary items to the visitations, although she had improved prior to trial. Due to issues with the visitation, Mother's supervised visitation was changed to therapeutic visitation in the second permanency plan.

---

[5] From the record, it appears that Mother may have also taken a drug screening the day before trial, which was also negative for illegal substances.

According to Ms. Shaw, Mother made improvements in her parenting "at the very end."

Foster Mother testified that the children are thriving and well-cared for in foster care. The children were placed in an initial foster home following the removal. On June 1, 2019, however, the first placement was disrupted due to marital problems experienced by the first foster family, as well as some behaviors of the children. The children were then placed with Foster Mother and her husband, where they remained at the time of trial. The children are the only children in the home. While the girls share a bedroom, JaDarian has his own room. The children play sports, including football and swim team. JaDarian has an individualized education plan to help with his speech delay, for which he receives in-school assistance. The youngest child suffers from a form of epilepsy, which requires medication and medical appointments. The two oldest children also attend "biweekly" mental health therapy appointments.[6] Foster Mother testified that it is her family's intention to adopt the children should they become available.

At the conclusion of trial, the trial court orally ruled that DCS had proven each of the grounds alleged in the petition, as well as that termination was in the children's best interests. A written order terminating Mother's parental rights was subsequently entered on October 4, 2019. Mother timely appealed to this Court.

## II.    ISSUES PRESENTED

On appeal, Mother challenges each of the grounds found by the trial court, as well as the trial court's finding that termination is in the children's best interest.

## III.    STANDARD OF REVIEW

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a

---

[6] It is not apparent from the record whether these appointments occur twice a week or every other week.

child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also **Santosky v. Kramer***, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. ***Santosky***, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); ***In re Valentine***, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W.3d at 523–24 (citing ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010); ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. ***In re M.L.P.***, 281 S.W.3d at 393 (quoting ***In re Adoption of A.M.H.***, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d at 246.

***In re Carrington H.***, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." ***In re Navada N.***, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing ***McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." ***In re Christopher J.***, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at \*3 (Tenn. Ct. App. Dec. 4, 2017) (citing ***Whitaker***, 957 S.W.2d at 837).

## IV. DISCUSSION

### A. Grounds for Termination

The trial court found four grounds for termination of Mother's parental rights: abandonment by failure to establish a suitable home, substantial noncompliance with permanency plans, persistence of conditions, and failure to manifest a willingness and ability to assume custody or financial responsibility for the children. We will therefore consider each ground in turn.

### 1. Abandonment by Failure to Establish a Suitable Home

Under Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian, as defined in § 36-1-102" may constitute a ground for termination. Section 36-1-102(a) in turn contains several definitions for the statutory ground of abandonment. The relevant definition of abandonment provides as follows:

> (*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made

reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

Tenn. Code Ann. § 36-1-102(a)(ii).

Here, there is no dispute that the children were removed from Mother's home and custody by order of March 16, 2018. Tenn. Code Ann. § 36-1-102(a)(ii)(a). In this order, the juvenile court specifically found that DCS made reasonable efforts to prevent the removal. Tenn. Code Ann. § 36-1-102(a)(ii)(b). Mother's brief does contain minimal argument concerning whether DCS made reasonable efforts following the removal. Mother concedes in her brief, however, that DCS did work with Mother to provide referrals for services, assistance with housing, bus passes, therapeutic parenting services, and frequent drug screens. The trial court found that DCS exercised reasonable efforts in this case, including by providing

> supervised visitation, ongoing case management, resource guide, child support services, random drug screens, home visits, nailbed drug testing, mental health assessment and treatment, alcohol and drug assessment and treatment, individual therapy, bus passes, assistance with housing appeal process, housing resources, therapeutic visitation, parenting classes, and diligent search for potential fathers of the children.

We agree that these efforts were sufficient both under the circumstances and compared to Mother's efforts.

Despite these efforts, Mother has failed to establish a suitable home for the children. In the months following the removal of her children, Mother was living in an apartment. Although this apartment was sometimes appropriate for the children, home visits showed that Mother at the very least allowed people visiting her to use marijuana in the home, despite knowing that her children were removed in part due to drug issues. This drug use occurred even months after the termination petition was filed, as late as May 15, 2019. A suitable home requires more than a safe physical structure, but also must be free from illegal drug use. *See **In re Jonathan F.**, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *12 (Tenn. Ct. App. Feb. 20, 2015).

Even if this home had been appropriate, however, it was not permanent. Due to maintenance issues, Mother refused to pay rent on the apartment, resulting in her

eviction. Mother thereafter failed to inform DCS where she was living until the day before trial, preventing DCS from inspecting this home. Finally, Mother admitted at trial that she could not provide a safe and stable home for the children at that time, conceding that she was still working on that particular necessity. *Cf. In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *12 (Tenn. Ct. App. Mar. 2, 2009) (holding that a parent's "past efforts cannot compensate for her present [lack of housing.]"). Thus, the trial court's description of Mother's current living situation as essentially "relying on the good will" of a friend in order to provide a home for her children, is accurate. Indeed, Mother's current living situation is so precarious that she asked DCS in the days before trial if moving to a hotel would be sufficient to provide the children with an appropriate home. Under these circumstances, we cannot conclude that the trial court erred in determining that Mother had yet to establish a suitable home and that based on her choices, she "appears unlikely [to] be able to provide a suitable home for the child[ren] at an early date." Tenn. Code Ann. § 36-1-102(a)(ii)(c). This ground is therefore affirmed.

## 2. Substantial Noncompliance with Permanency Plans

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a ground for termination exists when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]" Two permanency plans were ratified in this case with generally the same requirements: (1) pay child support; (2) visit regularly; (3) complete an alcohol and drug assessment and follow recommendations; (4) continue substance abuse aftercare; (5) complete a mental health assessment and follow recommendations; (6) participate in medication management, if required; (7) complete parenting education; (8) obtain and maintain safe and stable housing; (9) obtain and maintain a legal source of income; (10) allow quarterly home visits; (11) comply with all court orders, and (12) obtain and maintain a safe and reliable transportation plan.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Termination of parental rights under Tennessee Code Annotated section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed under section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656–57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 657 (citing *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, No. M2002-02235-COA-R3-

*JV*, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

Although the trial court did not make a specific finding that the permanency plan requirements were reasonable and related to remedying the conditions that caused the removal, Mother does not dispute that the plans' requirements met this standard. We agree. *Cf.* ***In re Valentine***, 79 S.W.3d at 547 ("Because the trial court made no finding regarding the reasonableness of Ms. Wallace's responsibilities under the permanency plans, our review of this issue is de novo."). Here, the requirements were agreed to by Mother in the trial court. Moreover, the requirements were related to the mental health, substance abuse, and environmental issues that led to the removal of the children and which prevented family reunification following the removal. ***Id.*** ("Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification.") As such, DCS met its burden to show the reasonableness of the requirements in this case.

The question of whether Mother substantially failed to comply with the permanency plan requirements is a somewhat closer question. Here, Mother asserts that she generally complied with the requirements of the plan by utilizing the bus as a transportation plan, maintaining a job, participating in assessments and parenting classes, attending visitations and counseling, paying some child support, and passing multiple drug screenings. Moreover, Mother contends that while she did not follow some of the recommendations from her assessments, some requirements were deleted after follow-up assessments concluded that Mother no longer needed more intensive drug treatment. Thus, Mother asserted at trial that the only requirement that she had not met was to obtain safe and stable housing.

The trial court disagreed, however, and made the following findings with regard to this ground:

> [Mother] has not substantially complied with the responsibilities and requirements set out for her in the permanency plans. [Mother] has not: paid child support regularly, visited the children regularly, completed the recommendations of her mental health and alcohol and drug assessments, obtained and maintained safe and stable housing, obtained a safe and reliable transportation plan, successfully completed therapeutic visitation, allow home visits, maintain legal income and demonstrate the skills learned in parenting education. [Mother] has continued to allow people in the home including former boyfriends, her brother, and other friends that are inappropriate. DCS conducted unannounced home visits in which clutter, environmental concerns, drug paraphernalia, and marijuana were observed; additionally, the DCS case manager observed different adults to be staying with [Mother] in her home and testified she smelled marijuana in the home on multiple occasions. [Mother] has not maintained regular visitation with her children.

- 10 -

Thus, the trial court specifically resolved some factual disputes against Mother, including her contention that she complied with the recommendations of her assessments, that she regularly visited and paid support, and that she had an appropriate transportation plan. The evidence does not preponderate against these factual findings. For example, while Mother claimed that she was no longer required to participate in more intensive drug treatment, she provided no documentation to support her testimony. Moreover, the evidence shows that Mother missed a substantial number of visits and counseling sessions. Thus, while Mother's use of the bus in and of itself is certainly not problematic, the fact that she continued to miss necessary appointments due to claimed issues regarding transportation shows that Mother's transportation plan is not sufficient to meet her needs. Moreover, the trial court was correct that Mother did not consistently pay the $120.00 per month in support as she had been ordered.[7]

Given these findings, we must agree with the trial court that Mother's noncompliance was substantial. Importantly, the children were removed from Mother's home in part due to her positive drug screenings. Although Mother appears to be maintaining her sobriety, she missed an important nail bed drug screening and continued to allow people into her home that actively used drugs even after the termination petition was filed. The importance of maintaining a home free from drugs simply cannot be overstated. *Cf. In re M.J.B.*, 140 S.W.3d at 657 (noting that the substantiality of a parent's noncompliance may be dependent on "the importance of the particular requirement"). Mother's inability to find adequate transportation was also troubling, as this impacted her ability to maintain contact with the children and treat her mental health and substance abuse issues through regular counseling. Finally, Mother admitted at trial that she had so far been unable to make progress in obtaining safe and stable housing for the children; instead, Mother relied on the kindness of a third-party for housing. Under these circumstances, we cannot conclude that the trial court erred in its determination that Mother had substantially failed to comply with the permanency plans.

### 3. Persistence of Conditions

The third ground for termination found by the trial court is commonly referred to as persistence of conditions or persistent conditions. The ground of persistent conditions is defined as follows:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has

---

[7] The records submitted as evidence at trial show that Mother never paid $120.00 per month in support. Mother was somewhat consistent in paying anywhere from $20.00 and $60.00 per month. Mother testified however, that she was not always employed and that much of her income went to other necessary expenses.

- 11 -

been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard; . . . .

Tenn. Code Ann. § 36-1-113(g)(3). In this case, the children were removed from Mother's home and custody by court order in the juvenile court dependency and neglect proceeding far more than six months prior to the termination hearing. As such, this ground is applicable.

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at \*6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)).

We cannot conclude that the trial court erred in finding sufficient evidence to

support this ground for termination. Here, the children were removed due to Mother's drug issues and neglect of the children; following the removal, issues related to Mother's mental health, housing, and lack of reliable transportation surfaced. At the time of trial, more than a year following the removal, these issues had not been remedied. Rather, Mother is still at best attending only half of her mental health counseling appointments and a little more than half her scheduled visitation. And regardless of whether Mother's failure to attend these appointments is due to issues of transportation or Mother simply forgetting the appointments, this issue is ongoing as Mother missed even the last visitation before the termination trial. Given that Mother cannot make her own appointments, there is a significant risk that Mother would be unable to ensure that the children attend all of their necessary appointments, as the children each have either educational, mental health, or physical issues that require attention. Finally, Mother's housing situation has not improved in the time since the children were removed. Although Mother initially had housing, it was often a place of drug use and Mother eventually lost her housing. Moreover, Mother's current housing situation is somewhat precarious and the appropriateness of the home could not be verified by DCS because Mother failed to provide DCS with information concerning it until a day before trial.

It is therefore reasonably likely that Mother's continued lack of attention to appointments, lack of reliable transportation, and lack of appropriate, stable housing would "cause the child[ren] to be subjected to further abuse or neglect" if the children were returned to her care. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Moreover, Mother's admitted lack of consistency in making progress in this case leads us to believe that there is "little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future." Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Finally, Foster Mother testified that she and her husband hope to adopt the children into their stable and appropriate home. As such, continuation of the relationship with Mother "diminishes the child[ren]'s chances of early integration into a safe, stable, and permanent home[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). Accordingly, this ground for termination is affirmed.

### 4. Willingness and Ability to Assume Custody or Financial Responsibility

Turning to the final statutory ground found by the trial court, parental rights can be terminated when

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; . . . .

Tenn. Code Ann. § 36-1-113(g)(14). This statutory ground is essentially two distinct elements that must each be proven by clear and convincing evidence:

First, DCS must prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].' DCS must then prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)). With regard to substantial harm, this Court has explained that

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *7 (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)).

In this case, there can be little dispute that Mother lacks the ability to assume physical custody of the children, as Mother admitted that she was still working on providing a home for the children. Moreover, although Mother had housing for herself, her plan was to move her three children into a single bedroom and "nook" with herself. Because Mother failed to inform DCS of her residence until the day before trial, DCS was unable to inspect this home; such inspection is necessary given the issues found by DCS in Mother's prior home. Finally, the evidence shows that the children have multiple weekly appointments to treat their array of issues. Mother's lack of consistent transportation and inability to remember appointments prevents her from keeping her own appointments, much less the multiple appointments that the children must attend.

There is also sufficient evidence that Mother has failed to manifest a willingness to assume custody and financial responsibility for the children. *Cf.* *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *8 (Tenn. Ct. App. Apr. 17, 2019) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018); *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018)) (recognizing a dispute over what proof is required to meet this ground for termination, but avoiding the dispute by noting that the proof was sufficient under even the more stringent ground). Here, Mother made decisions that impacted her ability to parent the children, including allowing herself to be evicted from her apartment over maintenance issues. Mother's employment following the removal was not consistent, with Mother sometimes voluntarily leaving her employment,

and Mother often failed to provide DCS with any proof of claimed employment. Mother also failed to attend a multitude of visitations with the children, sometimes stating that she simply forgot to do what was necessary to ensure that the visitation occurred. Indeed, Mother even failed to attend the visitation scheduled in the days before trial because she forgot to confirm the visitation with DCS. Finally, although Mother stated that she had a car, the car does not work and it appears that she made no effort in the months that the children were in custody to obtain a valid driver's license. These actions do no manifest a willingness to take the steps necessary to permit reunification with the children.

The evidence also clearly and convincingly supports the trial court's finding that placing the children in Mother's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Although Mother appears to have made commendable efforts on her own drug use issues, she has continued to allow individuals to use illegal drugs in her home well after the removal of her children and even following the filing of the termination petition. And again, Mother's inability to maintain her own appointments for counseling gives this Court little confidence that Mother would be able to maintain the appointments of her three children. These appointments, however, are necessary for the physical and psychological health of the children. Given these facts, the trial court did not err in finding a ground for termination under section 36-1-113(g)(14).

### B. Best Interest

Having determined that at least one ground for termination is supported by clear and convincing evidence, we proceed to consider whether clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in the child's best interests. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. *Id.*

Tennessee's termination statute lists the following factors to be used in the best interest analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

- 15 -

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681−82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193−94

(Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

The trial court found that Mother had not made a lasting change in circumstances despite reasonable efforts by DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). We agree. Despite a multitude of help from DCS, Mother was no closer to providing a safe and stable home for her children at the time of trial as she was at the removal. The trial court also found that Mother had not maintained consistent visitation with the children. The record indeed shows that Mother missed nearly half of her scheduled visitation, sometimes simply because she forgot about her children until it was too late. Tenn. Code Ann. § 36-1-113(i)(3). The trial court further found that a change in caretakers would be detrimental to the children. Tenn. Code Ann. § 36-1-113(i)(5). The evidence does not preponderate against this finding as the children are currently in a stable home that provides for their needs. Mother's ability to take the children to their various appointments and to provide a stable home is far less certain.

The trial also found that Mother has neglected the children and exposed them to drug use in her home. Tenn. Code Ann. § 36-1-113(i)(6) & (7). Mother indeed allowed individuals to use drugs in her home even after the children were removed by DCS. This drug use was found by DCS not once, but on multiple home visits, some more than a year after the removal of the children. Thus, while Mother testified that she has now learned to keep such people out of her life, Mother's unsupported claims at trial are generally "too little, too late," to show lasting progress as to this concern. *See, e.g., In re S.H.*, No. E2013-02007-COA-R3-PT, 2014 WL 1713769, at *8 (Tenn. Ct. App. Apr. 29, 2014) (holding that the parent's efforts were "too little, too late").

Mother contends, however, that the trial court erred in failing to recognize the progress that Mother has made given her limited means and resources. In support, Mother cites her completion of parenting education, her counseling, her current employment and payment of child support, and her sobriety. It is well-settled, however, that "[w]hen a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), then the interests of parent and child diverge. The focus shifts to the child's best interest." *In re Dominique L.H.*, 393 S.W.3d 710, 717 (Tenn. Ct. App. 2012) (citation omitted) (citing *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005)). As such, no matter how well-intentioned Mother was in this case, once a ground for termination has been found, we must focus on what is best for the children.

Here, we commend Mother on her significant period of continuing sobriety.

- 17 -

Despite Mother's progress, however, she simply cannot care for the children in any real fashion at this stage in her life. Mother has no permanent home and no reliable method to transport herself and her children where they need to go. We recognize that the children appear to know Mother as their parent and are happy to see her. Tenn. Code Ann. § 36-1-113(i)(4). Despite knowing this, however, Mother admits that she sometimes simply forgets to confirm her visits, despite reminders on her phone and calendars offered to her by DCS. Missing visitations is known to cause distress among the children, who blame themselves for Mother's repeated mistakes. Thus, even as late as the last visitation before trial, Mother simply forgot about her duty to her children despite knowing that it could cause them emotional harm. In contrast, the evidence shows that the children are well-provided for in their foster home and are thriving. Under these circumstances, we must conclude that the children's best interests are served by terminating Mother's parental rights.

## V.    CONCLUSION

The judgment of the Knox County Juvenile Court is affirmed, and this cause is remanded to the trial court for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Mahogany C., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE